*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 12a0300p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

EJS PROPERTIES, LLC,

              *Plaintiff-Appellant,*

    *v.*

CITY OF TOLEDO; ROBERT MCCLOSKEY, an individual,

              *Defendants-Appellees.*

No. 10-4471

_____

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 3:04-cv-7312—James G. Carr, District Judge.

Argued: April 19, 2012

Decided and Filed: September 5, 2012

Before: MOORE, GIBBONS, and ALARCÓN,[*] Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Timothy M. Rastello, HOLLAND & HART LLP, Denver, Colorado, for Appellant. Adam W. Loukx, CITY OF TOLEDO DEPARTMENT OF LAW, Toledo, Ohio, Jay E. Feldstein, KALNIZ, IORIO & FELDSTEIN, CO., LPA, Toledo, Ohio, for Appellees. **ON BRIEF:** Timothy M. Rastello, Peter C. Houtsma, HOLLAND & HART LLP, Denver, Colorado, Cary Cooper, COOPER & WALINSKI, LPA, Toledo, Ohio, for Appellant. Adam W. Loukx, CITY OF TOLEDO DEPARTMENT OF LAW, Toledo, Ohio, Jay E. Feldstein, Edward J. Stechschulte, KALNIZ, IORIO & FELDSTEIN, CO., LPA, Toledo, Ohio, for Appellees.

_____

[*]The Honorable Arthur L. Alarcón, Senior Judge for the United States Court of Appeals for the Ninth Circuit, sitting by designation.

––––––––––––––––––

**OPINION**

––––––––––––––––––

KAREN NELSON MOORE, Circuit Judge.  In 2002, EJS Properties, LLC ("EJS") wanted to build a charter school at a commercial site on the east side of Toledo. To do this, however, the site first needed to be re-zoned.  After initial support for re-zoning from Robert McCloskey, the region's city council representative, McCloskey eventually changed his mind and the Toledo City Council voted against re-zoning the site.  But according to EJS, McCloskey did more than just change his mind.  EJS claims that McCloskey's sudden reversal occurred only after EJS refused to acquiesce to McCloskey's demand that EJS donate $100,000 to a local retirement fund, a demand McCloskey does not deny that he made.

EJS sued the City of Toledo ("City") and Robert McCloskey under 42 U.S.C. § 1983, claiming violations of EJS's rights to substantive and procedural due process, its right to equal protection, and its right to petition under the First Amendment, and asserting a state-law claim of tortious interference with a business expectancy.  The district court granted summary judgment for the defendants on all of the constitutional claims.  The district court also granted summary judgment to the City on the state-law claim and EJS has since dropped its state-law claim against McCloskey.  The district court then denied EJS's motion for reconsideration.  EJS appeals with respect to the constitutional claims only.  For the following reasons, we **AFFIRM**.

**I.  BACKGROUND**

On April 3, 2002, EJS entered into a written agreement with Pilkington Corporation ("Pilkington") to purchase a twenty-acre parcel from a forty-three-acre lot that Pilkington owned on the east side of Toledo, including an existing technical center that EJS intended to convert into a charter school.  The agreement was expressly contingent on obtaining a zoning change away from M-2 (industrial district), which could not house a school.  J.A. at 69-70 (Purchase Agreement).  EJS also entered into

a fifteen-year lease agreement with Lake Erie Academy to open a charter school on the Pilkington site.  The lease had no express conditions.

In May 2002, EJS filed its re-zoning petition with the Toledo-Lucas County Plan Commission ("Plan Commission") seeking to change the zone from M-2 to C-2 for restricted offices.  The staff of the Plan Commission recommended instead a change to M-3 for a planned industrial district, which would accommodate both a school and light industry.  EJS accepted, and on June 13, 2002, the Plan Commission held a public hearing during which support for a charter school was mixed.  J.A. at 6-19 (Comm'n Hr'g Tr.).  Nonetheless, the Plan Commission recommended re-zoning the site to M-3 and passed the request to the Toledo City Council.

The City Council's Zoning and Planning Committee held a public hearing on the zoning request on July 17, 2002.  J.A. at 20-40 (Comm. Hr'g Tr.).  Concerns were raised about losing industrial options on the remainder of the lot, and everyone agreed to re-zone only the portion of the Pilkington property needed for the school to M-3 and to keep the remainder of the lot at M-2 for future industrial use.  *Id.* at 33-36.  The Committee, which consisted of seven City Council members, voted unanimously to recommend the request proceed to a full vote by the City Council.  *Id.* at 337 (Committee Vote).  Per the Toledo City Charter, the re-zoning request was drafted into Ordinance 643-02 and placed on the City Council's agenda for August 13, 2002.  *Id.* at 832-35 (Ordinance).

Prior to the meeting, two executives from Pilkington, John Keil and Randy Berg, had a lunch meeting with Robert McCloskey, who represented the city council district containing the Pilkington lot.  McCloskey allegedly asked Pilkington to contribute $100,000 to a local community center to assist retirees from Pilkington (formerly Libby Owens Ford) with prescription drug issues.[1]  The executives declined.  The parties debate whether the request was perceived as a quid pro quo exchange for his vote, but

---

[1]McCloskey was a former Pilkington/Libby Owens Ford union negotiator who had helped negotiate a labor agreement that capped healthcare benefits for retirees.  Upon being elected to City Council, he apparently faced significant criticism for his part in the union agreement.

there is no dispute that the request for money was at one point made. *See* Appellant Br. at 10-11; City Appellee Br. at 7; McCloskey Appellee Br. at 9. Meanwhile, during the re-zoning process, EJS began work on the site. EJS applied for and obtained an "early start building permit" to begin preliminary repairs on the building. EJS claims that it spent $200,000 on repairs and improvements during this time.

At the City Council meeting on August 13, 2002, council member Peter Gerken moved to table consideration of the matter for two weeks. EJS claims that prior to this meeting, McCloskey lobbied the other members to reverse their vote, and when he could not get enough to defeat the measure, McCloskey asked his "close friend" Peter Gerken to table the matter. Appellant Br. at 13. The defendants dispute these facts. J.A. at 745-47 (Gerken Dep.) (indicating desire to obtain information about an "industrial corridor"); *id.* at 844-45 (Toledo Blade Article) (same). Regardless of the reason, the matter was tabled to August 27, 2002.

The defendants concede that McCloskey then called Keil, Berg, and Erich Speckin, the owner of EJS, and left voicemails with each "seeking a monetary contribution to the retirees' fund in connection with the pending re-zoning Ordinance." McCloskey Appellee Br. at 9. In one call to Keil, McCloskey states:

> I am still looking to receive a check for $100,000 to the East Toledo Family Center and I have decided that, no punch line or anything, uh, that I really do not wish to get involved with. We brought this up at our agenda review meeting. We have decided to do a first reading on this. Then it will be heard at the Economic Development Committee sometime in November. Uh, if you want to see the budget goes, if you don't . . . hey that's cool. We'll allow it to die. Uh . . . please contact me. Thank you.

J.A. at 87 (voicemail transcription) (omissions in original).[2] In another to Keil, he states:

> I have not heard anything from Mr. Berg or anybody else but, uh, as far as I'm concerned, uh, I will not move the project out of committee. I've talked to the majority of council members and they agree with me. And

---

[2]Keil asked his secretary to transcribe the contents of the voicemails. J.A. at 517 (Keil Dep.). The accuracy of the transcriptions and the identity of the speaker are not contested.

when I explain the whole situation, and uh, I'm sure that City Council, if there are any questions about it, that when they hear the testimony in committee from all the retirees at LOF and how they've been treated, I think there will be a majority, er, uh at least 100% of the Council will say "forget it." So, you guys . . . need to do what you need to do.

J.A. at 89 (voicemail transcription) (omissions in original). The call to Speckin states:

This project is probably not going to happen. Pilkington & Libby Owens Ford are not coming to the table with anything to help. I have the votes on council to stop the project. I don't wish to do this but Pilkington is not cooperating so, therefore, I would be very reluctant to put up any signs at this particular time and also you do need some kind of sign permit to put up signs. Talk to you later.

J.A. at 91 (voicemail transcription). On August 20, 2002, the City Council held its bi-weekly agenda review meeting, during which it reviewed the ordinance. Nine council members were present, including McCloskey. Robert Williams, an assistant chief operating officer for the City attended to relay Mayor Jack Ford's position regarding the site. According to Williams, the Mayor indicated that he wanted the site to "remain zoned for industrial and commercial use," but he did not state that he opposed the re-zoning. J.A. at 646-48 (Williams Dep.).

On August 22, 2002, Keil sent a letter to all members of the City Council and Mayor Ford seeking support for the request and adding that "[c]onsideration should also be given to *unrelated* issues that may exist between [Pilkington and McCloskey]. Such issues have the potential for exploitation to the detriment of the zoning request . . . ." J.A. at 96 (Keil Letter). At no point did Pilkington or EJS notify the police or other members of the City Council about McCloskey's request for $100,000; however, at one point Keil informed someone at the Mayor's office of the request.

On August 27, 2002, the City Council voted 7-4 against Ordinance 643-02 to re-zone the Pilkington parcel sought by EJS. Of the seven, four had changed their vote from Committee:

| *Against* | *For* |
|---|---|
| Peter Ujvagi (Chair) - *changed* | Betty Schultz - *unchanged* |
| Robert McCloskey - *changed* | Rob Ludeman - *unchanged* |
| Tina Skeldon-Wozniak - *changed* | George Sarantou - *unchanged* |
| Wilma Brown - *changed* | Gene Zmuda |
| Wade Kapszulkiewicz | *Absent (not voting):* |
| Michael Ashford | Louis Escobar |
| Peter Gerken | |

Only Sarantou, who voted in favor of the ordinance, recalled being approached by McCloskey about the $100,000 request to Pilkington and that McCloskey indicated he "would like [Sarantou] to vote against this." J.A. at 586-87 (Sarantou Dep.). The remaining testimony by the council members was a mix of deference to McCloskey as the representative for the region where the site would be located, general interest in an industrial corridor, and occasionally knowledge of the request, but the testimony was generally inconclusive as to what exactly each member knew at the time of the vote.

EJS did not appeal the re-zoning denial.[3] Two months later, the voters of Toledo passed a levy for the Toledo Public Schools ("TPS") mandating the building of two new middle schools in the east side of Toledo. TPS initiated and by November 2003 had won an eminent domain lawsuit against Pilkington for the entire forty-three-acre site. TPS then applied to the Plan Commission to re-zone the lot from M-2 to R-3 to use the entire site as a campus. The Plan Commission approved, the City Council's Zoning and Planning Committee approved, and the full City Council unanimously approved by vote on January 27, 2004. There is now a TPS middle school on the property.

EJS filed its complaint in May 2004 against the City and Robert McCloskey in his individual capacity. EJS raised five claims all stemming from the treatment of EJS's zoning request: (1) deprivation of substantive due process; (2) deprivation of procedural due process; (3) deprivation of equal protection; (4) deprivation of its property rights in

---

[3]Instead, EJS entered into a purchase agreement in January 2003 with Pilkington to acquire the entire forty-three-acre lot. Speckin explained that EJS pursued the purchase after the re-zoning denial due to potential interest in having other parts of the lot leased. J.A. at 809-10 (Speckin Dep.). When Speckin started experiencing health problems and did not feel capable of "running down the lease," he backed out of the agreement. *Id.* at 810. Pilkington did not pursue legal action. *Id.* at 811.

violation of 42 U.S.C. § 1983; and (5) wrongful interference with a business expectation in violation of state law. R. 1 (Compl.).[4] EJS was permitted to amend the complaint to add another claim under 42 U.S.C. § 1983 for impeding EJS's First Amendment right to petition. R. 184 (11/30/07 Dist. Ct. Order).

Following various delays[5] and lengthy discovery, the defendants filed motions for summary judgment in early 2008. The district court granted summary judgment to the City and McCloskey on all of the federal constitutional claims. R. 336 (Dist. Ct. Order at 26). EJS's procedural and substantive due-process claims failed as a matter of law because each required a property interest, and the district court held that EJS had none at stake.[6] EJS's equal protection claim failed because EJS did not show that it was "similarly situated in all material respects" to TPS, the entity treated differently. And EJS's right to petition claim failed because EJS's right to petition the government was not impeded; how the government responded was irrelevant. After finding no underlying constitutional violations, the district court declined to address the defendants' arguments relating to qualified or municipal immunity. *Id.* at 22. The district court also granted summary judgment to the City on EJS's state-law claim of tortious interference in a business relationship on the basis of state-law immunity, which EJS does not appeal, but denied McCloskey summary judgment on that claim. *Id.* at 23-25.

EJS then moved for reconsideration, which the district court denied. R. 352 (9/2/2010 Dist. Ct. Order). With only one claim remaining—EJS's state-law claim against McCloskey for tortious interference—the district court granted EJS's unopposed

---

[4]Somewhat confusingly, the plaintiff's first three claims were all brought under the Constitution generally and only the fourth claim raises a violation under 42 U.S.C. § 1983. The district court treated all of the constitutional claims as § 1983 claims and did not treat the fourth claim separately, focusing on the alleged deprivation to property as part of the substantive and procedural due-process claims. *See* R. 336 (Dist. Ct. Order). The plaintiff has not objected to this characterization of his claims.

[5]In early 2006 McCloskey was indicted on federal criminal corruption charges and the district court stayed the proceedings pending the outcome of that case. R. 112 (3/13/2006 Dist. Ct. Order). McCloskey pleaded guilty and was sentenced to twenty-seven months in prison. He was released in July 2008. The civil case was re-opened in January 2007 and motions re-filed anew. The facts of the criminal case, however, appear distinct from the present facts.

[6]The district court suggested at oral argument that it would allow the procedural due-process claim, but granted summary judgment upon realizing that it "had overlooked the predicate requirement" of a property interest on that claim as well. R. 336 (Dist. Ct. Order at 18 n.5).

motion to certify the August 27, 2009, order as final under Federal Rule of Civil Procedure 54(b) and stay the proceedings.  R. 356 (10/13/2010 Dist. Ct. Order).  EJS filed its timely notice of appeal on November 9, 2010.  After we dismissed the appeal due to certain jurisdictional defects in the district court's certification under Rule 54(b), *EJS Properties, LLC v. City of Toledo*, — F.3d —, No. 10-4471, 2012 WL 3117221, at *2 (6th Cir. Aug. 2, 2012), EJS agreed voluntarily to dismiss the remaining state-law claim against McCloskey.  We now have jurisdiction under 28 U.S.C. § 1291.

## II.  STANDARD OF REVIEW

We review de novo a district court's grant of summary judgment.  *Int'l Union v. Cummins, Inc.*, 434 F.3d 478, 483 (6th Cir. 2006).  Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When reviewing the evidence, we draw all inferences in the light most favorable to EJS as the non-moving party.  *Cummins*, 434 F.3d at 483.  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## III.  PROCEDURAL AND SUBSTANTIVE DUE-PROCESS CLAIMS

The Fourteenth Amendment of the United States Constitution protects individuals from the deprivation "of life, liberty, or property, without due process of law."  U.S. CONST. amend. XIV, § 1.  The clause has both a substantive and a procedural component.  Procedural due process is traditionally viewed as the requirement that the government provide a "fair procedure" when depriving someone of life, liberty, or property; substantive due process "protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them."  *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992) (internal quotation marks omitted); *see also Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1216 (6th Cir. 1992).

To make out a claim for a violation of procedural due process, the plaintiff has the burden of showing that "(1) he had a life, liberty, or property interest protected by the Due Process Clause; (2) he was deprived of this protected interest; and (3) the state did not afford him adequate procedural rights prior to depriving him of the property interest." *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006).[7] We have previously held that substantive due-process claims raised in the context of zoning regulations require a plaintiff to show "that (1) a constitutionally protected property or liberty interest exists, and (2) the constitutionally protected interest has been deprived through arbitrary and capricious action." *Braun v. Ann Arbor Charter Twp.*, 519 F.3d 564, 573 (6th Cir.), *cert. denied*, 555 U.S. 1062 (2008).

Based on these principles, the district court held that both substantive and procedural due-process claims require the deprivation of a liberty or property interest. Because the district court could identify no such interest, both of EJS's due-process claims failed as a matter of law. EJS disputes that it lacked a liberty or property interest, and EJS also disputes that such an interest is required for certain kinds of substantive due-process claims.

## A. Property Interest

Whether a person has a "property" interest is traditionally a question of state law. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430 (1982) ("The hallmark of property . . . is an individual entitlement grounded in state law."). However, "[a]lthough the underlying substantive interest is created by an independent source such as state law, *federal constitutional law* determines whether that interest rises to the level of a legitimate claim of entitlement protected by the Due Process Clause." *Town of Castle Rock v. Gonzales*, 545 U.S 748, 757 (2005) (internal quotation marks omitted); *see also Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 571-72 (1972).

---

[7]The defendants do not argue that EJS's failure to appeal the City Council's zoning decision should defeat its claim under *Parratt v. Taylor*, 451 U.S. 527 (1981); therefore, we do not consider that issue.

EJS argues that it had property interests in (1) its "previously approved" re-zoning ordinance; (2) its contracts, including the land purchase contract with Pilkington and its lease agreement with Lake Erie Academy; and (3) its early-start building permit.

**1. Expectation of Re-Zoning**

"[A] party cannot possess a property interest in the receipt of a benefit when the state's decision to award or withhold the benefit is wholly discretionary." *Med Corp., Inc. v. City of Lima*, 296 F.3d 404, 409 (6th Cir. 2002). Property owners may have a property interest in the existing zoning classification for their property. *Nasierowski Bros. Inv. Co. v. City of Sterling Heights*, 949 F.2d 890, 897 (6th Cir. 1991). Property owners similarly have an interest in a discretionary benefit, such as a re-zoning ordinance, after it is conferred. *Buckeye Cmty. Hope Found. v. City of Cuyahoga Falls*, 263 F.3d 627, 642 (6th Cir. 2001) (holding property interest in ordinance after approved), *rev'd on other grounds*, 538 U.S. 188 (2003).

EJS attempts to avail itself of these principles by suggesting that the re-zoning ordinance here was "previously approved." Appellant Br. at 26. However, EJS concedes that the City Council had never approved the ordinance, as is required; only the Planning Commission and the Committee had approved it. Thus, to establish a property interest in the re-zoning ordinance, EJS must demonstrate that the City Council lacked "discretion to deny [EJS's] use of the land [as a school] if [it] complied with certain, minimum, mandatory requirements." *Silver v. Franklin Twp., Bd. of Zoning Appeals*, 966 F.2d 1031, 1036 (6th Cir. 1992). EJS cannot meet this burden because of the categorically discretionary nature of the zoning procedures used by the City of Toledo.

Ohio law states that "the legislative authority of such municipal corporation *may* amend or change the . . . [zoning] regulations of or within any district." Ohio Rev. Code § 713.10 (emphasis added). The Toledo Municipal Code also provides purely discretionary authority with respect to these decisions: "Council *may*, after public notice and hearings as provided in this section and after report by the City Plan Commission . . . amend, supplement or change the text or District Map herein or subsequently

established." Toledo Mun. Code § 1111.01(a), available at City Appellee Br. at 60. The word "may" establishes "sufficient discretion to undercut any argument that the language of the zoning regulations vested in [EJS] an entitlement to the [re-zoning ordinance] once the [minimum requirements] were fulfilled." *Triomphe Investors v. City of Northwood*, 49 F.3d 198, 203 (6th Cir. 1995) (internal quotation marks omitted); *Braun*, 519 F.3d at 573 ("[City Council] certainly possessed the discretion to deny the plaintiffs' request; consequently, no cognizable property right exists, which, in turn, means that procedural due process protections are not triggered."). This case is therefore fundamentally distinct from those where the benefit was awarded as a matter of course.[8]

EJS does not dispute these provisions; rather, EJS argues that in practice, the Toledo City Council's approval of an ordinance was "pro forma" such that EJS had a legitimate expectation of receiving approval. Alternatively, EJS argues that even if the City Council had discretion, such discretion "must be exercised free of corruption and illicit motives." Appellant Br. at 27. We do not agree that a benefit ceases to be discretionary depending on whether the discretion is exercised free of corruption. The law is clear that a party cannot have a property interest in a discretionary benefit, even if that discretion had never been exercised previously. *See Mich. Envtl. Res. Assocs., Inc. v. Cnty. of Macomb*, No. 87-2029, 1989 WL 54116, at *4 (6th Cir. May 23, 1989) (unpublished opinion) (holding no property interest in permit where board had discretion to reject, despite committee's prior approval).

### 2. Contracts

The right to contract is a property right under Ohio law. *Mertik v. Blalock*, 983 F.2d 1353, 1360 (6th Cir. 1993) (citing *Joseph Bros. v. Brown*, 415 N.E.2d 987, 990 (Ohio Ct. App. 1979)). The interests created by contracts are also property interests. *Joseph Bros.*, 415 N.E.2d at 990. The district court initially held that EJS had no property interest in either its purchase contract with Pilkington or its lease with Lake

---

[8]Nor does EJS allege injury to its *claim* for discretionary benefits. Indeed, EJS fully controlled the contents of its application, which was accurately and fully presented to the City Council, even if it alleges improper consideration by the individual council members.

Erie Academy for the same reasons that EJS lacked a property interest in the re-zoning ordinance: "[EJS] has no legitimate claim of entitlement to the re-zoning ordinance, purchase or lease agreement." R. 336 (Dist. Ct. Order at 17). On reconsideration, the district court acknowledged this wording as "imprecise," R. 352 (Dist. Ct. Order at 18 n.18), and clarified that although EJS certainly has a property interest in its contracts and its right to contract, there was no evidence that the defendants interfered with EJS's right to contract by declining to make a discretionary decision for EJS's benefit. EJS's argument is not that its right to enter the contracts was violated; rather, EJS argues that its interests created in contract were taken without due process. The question is therefore what interests were created by the purchase agreement and lease and what impact the defendants' actions had on those interests.

Consistent with many states, Ohio has held that the purchaser in an executory contract for the sale of land, prior to conveyance, "has an equitable interest in the realty equal to the amount of the purchase money paid. When full payment is made, the vendee acquires a completed equity which may entitle him to a conveyance of the legal title." *Butcher v. Kagey Lumber Co.*, 128 N.E.2d 54, 56 (Ohio 1955); *Bryan v. City of Madison*, 213 F.3d 267, 275-76 (5th Cir. 2000) (holding that prior to conveyance, buyer has the "right to get the down payment if the seller does not make good title" under Mississippi law), *cert. denied*, 531 U.S. 1145 (2001); *Coggshal v. Marine Bank Co.*, 57 N.E. 1086, 1088 (Ohio 1900) (vendor in executory contract retains legal title, which includes the right to ejectment). Here, however, the purchase agreement explicitly rejects any claim of interest by EJS in the property prior to closing: "*No Interest* Buyer acknowledges and agrees that prior to the Closing Date, it has no title or estate in the Property, the Licensed Area or any part thereof, and will not claim any such interest nor any easement over any part of the Property." J.A. at 73 (Addendum to Purchase Contract at ¶ 8). EJS cannot now claim that the contract created an interest that the contract itself explicitly disclaims.

The lease agreement is unusual because the validity of the contract itself depended on EJS's ability to acquire title to the land it was attempting to lease.

Although the lease agreement was not explicitly contingent upon obtaining re-zoning, EJS's ownership of the property was an implied condition precedent to the validity of the lease because the contract could not be fulfilled without it. "[A] contract, fulfillment of which, by express *or implied agreement*, is made to depend on act or consent of third person, over whom neither party has any control, cannot be enforced, unless such act is performed or consent given, *and reasons given for third person's failure or refusal to act or give consent are immaterial*, except for fault of promisor." *Kandel v. Gran*, No. CA-5475, 1981 WL 6324, at *4 (Ohio Ct. App. June 17, 1981). Thus, the lease agreement conferred on EJS only the right to rent the property to Lake Erie Academy upon obtaining satisfactory title. The actions of the defendant in this case may have amounted to tortious interference under state law for wrongful defeat of the condition precedent, but the lease agreement did not create a constitutionally protected interest in having the implied condition fulfilled. A property owner cannot create an interest in discretionary re-zoning simply by conveying his land to another party contingent upon obtaining re-zoning.

EJS points to one of our prior opinions and argues it reaches the opposite conclusion. In *G.M. Engineers and Associates, Inc. v. West Bloomfield Township*, 922 F.2d 328 (6th Cir. 1990), we held that a real-estate developer who entered into a land-development contract contingent on obtaining city approval of the development plans had a protectable property interest in her contractual right to develop the land. "Under Michigan law, contracts are recognized as property . . . even when the contract rights are subject to being defeated." 922 F.2d at 330-31. However, we identified the contractual right as a property interest only in the context of the plaintiff's takings claim. When analyzing the due-process claim, we noted that the plaintiff would not have protectable property or liberty interest "[i]f . . . the board members had discretion as to whether or not to approve the proposal."[9] *Id.* at 331 (footnote omitted). Thus, even if

_____

[9]We ultimately did not decide whether the plaintiffs in *G.M. Engineers* had a property interest for their due-process claim because we held that if approval was not discretionary, the plaintiff was functionally arguing that the board acted illegally under state law, and plaintiffs had failed to demonstrate the state's corrective procedures were inadequate as required under *Parratt. See G.M. Eng'rs*, 922 F.2d at 332.

Ohio also recognizes contingent contracts as property, and EJS has pointed us to no law suggesting that Ohio does,[10] under *G.M. Engineers* the discretionary nature of the contingency remains determinative of whether EJS has an interest at stake.

### 3. Early-start building permit

The district court did not address the building permit in either its order on summary judgment or on reconsideration. We agree with the defendants that EJS never asserted the building permit as an independent property interest below. However, even were we to consider the building permit, EJS's claim still lacks merit. EJS likely has a property interest in its early-start building permit, *see Chandler v. Vill. of Chagrin Falls*, 296 F. App'x 463, 469 (6th Cir. 2008) (unpublished opinion), but the interests conveyed by the permit were limited to initial renovations, which EJS did without interference or revocation. The permit did not entitle EJS to the ultimate re-zoning change or to a full permit to reconstruct the relevant property. Early authorization permits are "limited to work up to the rough-in-stage," and the work is "performed at the applicant's risk." Toledo Mun. Code § 1307.08(c), *available at* City Appellee Br. at 5. Therefore, the defendants' actions cannot be said to have deprived EJS of its interest in the early-authorization permit.

## B. Liberty Interest

EJS argues that it has two liberty interests that were violated by the defendants: (1) a liberty interest in a government decision free from corruption; and (2) a liberty interest in the pursuit of business contracts without unlawful interference. The district court held that there was no independent liberty interest in corruption-free government

---

[10]EJS relies only on *Wilson v. Trustees Union Township*, No. CA-98-06-036, 1998 WL 744089 (Ohio Ct. App. Oct. 26, 1998), which was a case about *standing* to pursue constitutional claims relating to discretionary zoning ordinances and did not hold that the plaintiff had a property interest in the contract based on a contingency. The district court correctly distinguished these issues. *See also Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 261-62 (1977) (holding real-estate developer had standing to pursue equal-protection claim alleging racial animus in zoning decision). *Arlington Heights* does not discuss whether the real-estate developer had acquired a property interest, because an equal-protection claim does not require an injury to property. Ohio has repeatedly emphasized that "one who purchases property in the hopes of gambling on securing a change in zoning has no right to complain if the legislative body declines to rezone the property for the gambling buyer's benefit." *Wilson*, 1998 WL 744089, at *4; *Smythe v. Butler Twp.*, 620 N.E.2d 901, 904 (Ohio Ct. App. 1993).

action; corruption bears on whether an individual with a liberty or property interest received procedural due process. R. 352 (Dist. Ct. Order at 5-9). The district court dismissed the contract argument for the same reason it dismissed the argument that the contracts were property, holding the defendants did not interfere with EJS's contracts because they were contingent on the discretionary zoning. *Id.* at 5 n.3. We address EJS's right-to-contract argument first.

The right to contract is a long-recognized liberty interest. The "Fourteenth Amendment liberty includes the right . . . to enter into all contracts which may be proper, necessary and essential" to a citizen's needs. *Washington v. Glucksberg*, 521 U.S. 702, 760 (1997) (internal quotation marks omitted). EJS's argument regarding its liberty interest in contracts is short and relies solely on its argument with respect to its property interest in the relevant contracts. Appellant Br. at 40. EJS does not allege that it was deprived of the general right to enter into contracts, but rather, that it was deprived of the right "to pursue its contractual relationships without unlawful interference from governmental officials in the form of extortion and bribery." *Id.* The cases cited by EJS identify the general right to contract but do not stand for the proposition that the right to enter into contracts free from interference includes the right to be free from government interference with the occurrence of a wholly discretionary condition precedent to such contracts. *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923); *Roth*, 408 U.S. at 572; *United of Omaha Life Ins. Co. v. Solomon*, 960 F.2d 31, 34-35 (6th Cir. 1992). EJS's failure to discuss more thoroughly its liberty interest makes it difficult to analyze whether it suffered a deprivation. *See Glucksberg*, 521 U.S. at 722-23. However, given that the contracts were entered into freely, EJS's claim sounds more in tort law than in a violation of a liberty interest. *See Khan v. Gallitano*, 180 F.3d 829, 835 (7th Cir. 1999).

EJS's first asserted liberty interest in the right to corruption-free government action is more complicated. The right to liberty means "more than the absence of physical restraint." *Glucksberg*, 521 U.S. at 719. "[I]n addition to the specific freedoms protected by the Bill of Rights, the 'liberty' specially protected by the Due Process

Clause includes the rights to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, and to abortion." *Id.* at 720 (citations omitted). The list of liberty interests and fundamental rights "is short, and the Supreme Court has expressed very little interest in expanding it." *Seal v. Morgan*, 229 F.3d 567, 574-75 (6th Cir. 2000). "In analyzing whether a particular right implicates the protection of the Due Process Clause, we first carefully define the asserted right and then ask whether it is 'deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed.'" *Johnson v. City of Cincinnati*, 310 F.3d 484, 495 (6th Cir. 2002), *cert. denied*, 539 U.S. 915 (2003).

We have found no support for the proposition that a citizen has a fundamental right or liberty interest in having the government make discretionary decisions free from corruption independently from whether the citizen has a separate property or liberty interest at stake. EJS relies almost exclusively on *Hammond v. Baldwin*, 866 F.2d 172, 176 (6th Cir. 1989), to suggest a stand-alone liberty interest in fair procedures. In *Hammond*, the court said "submission to a fatally biased decisionmaking process is in itself a constitutional injury." *Id.* (internal quotation marks and alteration omitted). The district court rightly held that *Hammond* did not apply because it related to justiciability: The plaintiff must still allege and prove deprivation of property, but the "[s]ubmission to a fatally biased decision-making process is the injury, and courts do not have to wait for the outcome of the deficient process to review it." R. 336 (Dist. Ct. Order at 18). Indeed, other cases have rejected the concept that there is a fundamental right to be free from tortious interference by third-party state actors. *Khan*, 180 F.3d at 835; *see also Vasquez v. City of Hamtramck*, 757 F.2d 771, 772-73 (6th Cir. 1985) (no constitutionally protected liberty interest in being free from falsely written tickets).[11]

---

[11]EJS also cites *Wilkerson v. Johnson*, 699 F.2d 325, 328 (6th Cir. 1983), but *Wilkerson*'s broad language must be read in context. *Wilkerson* identified a liberty interest in obtaining employment and held that such an interest should be protected from "gross governmental violations exemplified by bribery and corruption" through the "[t]he regular and impartial administration of public rules governing these interests, as required by due process." *Id. Wilkerson* did not hold that all individuals have a liberty interest in impartial government decision making.

Although a compelling proposition, we decline to create today a new liberty interest in corruption-free decision making. We agree with the district court that a distinction must be drawn between the quality of the process owed a protected interest and the interest itself. Corruption may give rise to a number of legal consequences—criminal sanctions by the state, civil penalties, and private liability under state tort law. At least under the circumstances presented to us today, we see no compelling reason to create a constitutional remedy for such behavior absent a protected interest at stake.

## C. "Shocks the Conscience" Claim

In a variation of its liberty-interest argument on corruption, EJS argues that corrupt zoning decisions that "shock the conscience" violate substantive due process regardless of whether a property or liberty interest is at stake. The district court held that even in such instances, the plaintiff must show as a predicate the deprivation of a liberty or property interest. R. 336 (Dist. Ct. Order at 16).[12]

There is ample support for the district court's conclusion in our case law. *See Braun*, 519 F.3d at 573 ("To state a substantive due process claim in the context of zoning regulations, a plaintiff must establish that (1) a constitutionally protected property or liberty interest exists, and (2) the constitutionally protected interest has been deprived through arbitrary and capricious action." (internal quotation marks omitted)); *Bowers v. City of Flint*, 325 F.3d 758, 764 (6th Cir. 2003) (assuming property interest in contract when evaluating egregious abuse of power allegations); *Silver*, 966 F.2d at 1036 ("To establish a violation of substantive due process, a plaintiff must first establish the existence of a constitutionally-protected property or liberty interest."); *Triomphe Investors*, 49 F.3d at 204 (holding failure to identify constitutionally protected property interest defeated substantive due-process claims); *Andreano v. City of Westlake*, 136 F.

---

[12]The district court also held that EJS's "shocks the conscience" argument was equally unavailing because that standard "applies to executive, not legislative action." R. 336 (Dist. Ct. Order at 16). We have found no support for this statement, and it is not necessary to decide whether the zoning action in this case should be categorized as legislative or administrative because under either standard EJS's claims fail. *See Pearson*, 961 F.2d at 1224.

App'x 865, 870-71 (6th Cir. 2005) (unpublished opinion) ("Proving a violation of substantive due process requires not only that the challenged state action was arbitrary and capricious, but also that the plaintiff has a constitutionally protected property or liberty interest."); *Taylor Acquisitions, L.L.C. v. City of Taylor*, 313 F. App'x 826, 834 (6th Cir. 2009) (unpublished opinion) ("[I]nsofar as Plaintiff has failed to assert a property or liberty interest for purposes of procedural due process, its substantive due process claims also fail."), *cert. denied*, 130 S. Ct. 299 (2009). Even cases involving the "egregious abuse of government power" also discuss the interest at stake. *See Vinson v. Campbell Cnty. Fiscal Ct.*, 820 F.2d 194, 201 (6th Cir. 1987) (malicious deprivation of mother's liberty interest in custody of her children sufficient to state a substantive due-process claim).

Other cases, however, discuss substantive due-process claims independently from the identification of any liberty or property interest. In *Valot*, the plaintiffs conceded that they were not deprived of a property right. *Valot v. S.E. Local School Dist. Bd. of Educ.*, 107 F.3d 1220, 1228 (6th Cir. 1997). We then identified substantive due-process claims as falling into "into two categories: (1) deprivations of a particular constitutional guarantee; and (2) actions that 'shock the conscience.'" *Id.* We rejected the plaintiff's substantive due-process claim because the "Defendants' decision not to rehire Plaintiffs did not deprive them of a particular constitutional guarantee and does not shock the conscience," and the decision was sustainable under rational-basis review. *Id.*

In *Pearson,* 961 F.2d 1211, we outlined at length the numerous competing views on substantive due-process claims in the zoning context. We determined that the "shocks the conscience" terminology was indeed relevant in the zoning context "to emphasize the degree of arbitrariness required to set aside a zoning decision by a local authority—and to underscore the overriding precept that 'arbitrary and capricious' in the federal substantive due process context means something far different than in state administrative law." *Id.* at 1222. The plaintiff in *Pearson* was similarly situated to EJS in that he sought a discretionary zoning decision for his property. We discussed the positions of the other circuits, some of which more strictly required a property interest

than others, and concluded that "substantive due process requires that both state legislative and administrative actions that deprive the citizen of 'life, liberty or property' must have some rational basis." *Id.* at 1223. We ultimately held that there could be no violation because the state's action in denying the re-zoning had a rational basis. *Id.* at 1223-24.

What these cases tell us is that substantive due process is not a rigid conception, nor does it offer recourse for every wrongful action taken by the government. "Substantive due process affords only those protections so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Charles v. Baesler*, 910 F.2d 1349, 1353 (6th Cir. 1990) (internal quotation marks and citation omitted). We recently clarified that although "plaintiff[s] must demonstrate a deprivation of a constitutionally protected liberty or property interest in order to establish a due process violation based on discretionary conduct of government officials, such a showing is not necessary to establish that a state law is unconstitutional." *Am. Express Travel Related Servs. Co. v. Kentucky*, 641 F.3d 685, 688-89 (6th Cir. 2011) (citation omitted). We have also distinguished between constitutionally protected interests and garden-variety interests. "Most, if not all, state-created contract rights, while assuredly protected by procedural due process, are not protected by substantive due process." *Charles*, 910 F.2d at 1353; *Bowers*, 325 F.3d at 764 (holding contractual right to discounted water not protected by substantive due process). In short, although government action may certainly shock the conscience or violate substantive due process without a liberty or property interest at stake, as was the case in *American Express*, our prior precedent makes clear that in the context of a discretionary zoning decision, government action will not shock the conscience unless the arbitrary and capricious action touches on a protectable interest. Because EJS had no protectable interest, its substantive due-process claim must fail.

Finally, we note that even if such an interest is not required, the behavior against EJS in this case does not "shock the conscience." Perhaps it is unfortunate that the solicitation of a bribe by a public official does not shock our collective conscience the way that pumping a detainee's stomach does. But, although we can condemn

McCloskey for his misconduct, we simply cannot say that his behavior is so shocking as to shake the foundations of this country. "While appellees' alleged conduct was reprehensible, it was not that type of conduct which so 'shocks the conscience' that it violates appellant's substantive due process rights. A citizen does not suffer a constitutional deprivation every time he is subject to the petty harassment of a state agent." *Vasquez*, 757 F.2d at 773 (citation omitted). And, as we discuss in greater detail in Section V, the decision not to grant re-zoning passes rational-basis review in light of the clearly expressed desire at numerous meetings to maintain the area for future industrial use. Summary judgment was appropriately granted against EJS's substantive and procedural due-process claims.

## IV.  RIGHT TO PETITION CLAIM

The First Amendment protects "the right of the people . . . to petition the Government for a redress of grievances." U.S. CONST. amend. I. This right "extends to all departments of the Government." *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972). However, "[n]othing in the First Amendment or in this Court's case law interpreting it suggests that the rights to speak, associate, and petition require government policymakers to listen or respond to individuals' communications on public issues." *Minn. State Bd. for Cmty. Colls. v. Knight*, 465 U.S. 271, 285 (1984) (citing *Smith v. Ark. State Highway Emps., Local 1315*, 441 U.S. 463 (1979)).

"The threshold question in a right-to-petition case . . . is . . . whether the plaintiff's conduct deserves constitutional protection." *Holzemer v. City of Memphis*, 621 F.3d 512, 520 (6th Cir. 2010) (quoting *Campbell v. PMI Food Equip. Grp.*, 509 F.3d 776, 789 (6th Cir. 2007)). We have not yet addressed whether zoning requests constitute protected conduct. We have, however, held more generally that seeking redress from a government official qualifies as petitioning, and a zoning request certainly qualifies under this standard. *Id.* at 520; *see also White v. Lee*, 227 F.3d 1214, 1227 (9th Cir.

2000) (petition in opposition of a proposed zoning change protected under First Amendment).[13]

The district court focused on traditional First Amendment doctrine from the right-to-speech cases and held that EJS must show that the defendants' actions "might have chilled" EJS's right to petition. This is consistent with our general instruction that right-to-petition claims are viewed in kind with right-to-speech claims, *Campbell*, 509 F.3d at 789, and is consistent with how other circuits approach right-to-petition claims, *see, e.g.*, *O'Keefe v. Van Boening*, 82 F.3d 322 (9th Cir. 1996) (evaluating infringement of right to petition by analogy to chilling of right to speech). And an initial requirement of right-to-speech First Amendment infringement actions is that the individual show that the government actions chilled his expression. *Laird v. Tatum*, 408 U.S. 1, 11 (1972).

EJS does not argue that its rights were "chilled" in the traditional sense; rather, EJS argues that its right to *meaningful* access was infringed by the defendants' actions. The right to meaningful access to the courts is also protected by the Petition Clause, among other provisions. *John L. v. Adams*, 969 F.2d 228, 231-32 (6th Cir. 1992); *Silva v. Di Vittorio*, 658 F.3d 1090, 1101-02 (9th Cir. 2011) ("Under the First Amendment, a prisoner has both a right to meaningful access to the courts and a broader right to petition the government for a redress of his grievances."); *Snyder v. Nolen*, 380 F.3d 279, 291 (7th Cir. 2004) (citing *Johnson v. Atkins*, 999 F.2d 99, 100 (5th Cir. 1993)). The Supreme Court has repeatedly confirmed this right. *See, e.g.*, *Hudson v. Palmer*, 468 U.S. 517, 523 (1984) (the right to petition "includes a reasonable right of access to the courts"); *see also Bounds v. Smith*, 430 U.S. 817, 822-25 (1977) (discussing "meaningful access" as part of right to due process).

We therefore do not focus only on the narrow question of whether EJS established that the defendants' actions "might have chilled" EJS's right to petition. R. 336 (Dist. Ct. Order at 22). However, in all of the cases addressing meaningful access,

---

[13]The defendants do not argue that a request for re-zoning is not a petition to the government for redress; rather, they argue that EJS's rights were not violated by their acts. *See* McCloskey Br. at 47 (acknowledging right to petition for zoning changes); City Br. at 36.

the focus is on the *access* to the court, not the court's response or behavior upon receiving the petition. *See John L.*, 969 F.2d at 234 (discussing ability of prisoner to file meaningful documents with court); *Snyder*, 380 F.3d at 294 (ability to file timely documents). As the Sixth Circuit stated in *John L.*, 969 F.3d at 233-34, the *access* must be "adequate, effective and meaningful," and should be evaluated on a case-by-case basis. EJS's argument equates meaningful *access* with meaningful *process* after complete access has been achieved, but we have found no support for the proposition that the right to meaningful access is the same as the right to meaningful process.[14]

Access is generally defined as "[a]n opportunity or ability to enter, approach, pass to and from, or communicate with." BLACK'S LAW DICTIONARY (9th ed. 2009). Process is traditionally a Fifth and Fourteenth Amendment consideration, which as discussed above, requires the deprivation of a property interest before rising to the level of a constitutional violation. This distinction is consistent with the Supreme Court jurisprudence establishing that the right to petition does not "require government policymakers to listen or respond." *Minn. State Bd.*, 465 U.S. at 285. We therefore affirm the district court's decision that EJS's First Amendment right to petition was not violated.

## V.  EQUAL-PROTECTION CLAIM

The Equal Protection Clause of the Constitution provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. The clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). The parties agree with the district court that rational-basis review is appropriate here because there are "no suspect classifications or fundamental rights" at issue. R. 336 (Dist. Ct. Order at 19). A "class of one" may bring an equal-protection

---

[14]The only case offered by EJS, *Hampton Bays Connections, Inc. v. Duffy*, 127 F. Supp. 2d 364, 374 (E.D.N.Y. 2001), aside from being non-binding, equated a town's denial of an application to retaliation for the exercise of the developer's rights to petition when the denial was impermissibly motivated. EJS does not allege that the City Council's denial in this case was in retaliation for the exercise of EJS's First Amendment rights.

claim, "where the plaintiff alleges that the state treated the plaintiff differently from others similarly situated and that there is no rational basis for such difference in treatment." *Warren v. City of Athens*, 411 F.3d 697, 710 (6th Cir. 2005) (citing *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).**[15]**

To prevail, EJS must show that (1) the government treated EJS differently from a similarly situated party, and (2) the government had no rational basis to do so. *Id.* When evaluating whether parties are similarly situated, "courts should not demand exact correlation, but should instead seek relevant similarity." *Perry v. McGinnis*, 209 F.3d 597, 601 (6th Cir. 2000). Regarding rational basis, a plaintiff can establish the lack of a rational basis if it either (1) "negat[es] every conceivable basis which might support the government action or [(2)] demonstrat[es] that the challenged government action was motivated by animus or ill-will." *Warren*, 411 F.3d at 711 (internal quotation marks omitted).

Starting with the issue of a rational basis for the government's actions, the district court presented several conceivable bases for supporting the decision to grant a license to TPS but not EJS. Unlike EJS, TPS owned the relevant property when it applied for re-zoning. R. 336 (Dist. Ct. Order at 20). As a result, the piece of land was "lost to the City for future industrial purposes" and "the City had no practical alternative to granting the necessary rezoning to enable its use for educational purposes." *Id.* Another difference was that TPS "intended to use the entire site," whereas EJS had plans to split the lot, and TPS's plan to build a large public school would be more financially stable than a potential charter school. *Id.*[16] These are all rational bases for treating TPS

---

**[15]**The Supreme Court recently held that class-of-one equal-protection claims cannot be raised in the public-employment context, *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 602-05 (2008), relying in part on the discretionary nature of decisions in that context. We have not yet decided in a published opinion whether this reasoning should extend to other discretionary acts. *See Franks v. Rubitschun*, 312 F. App'x 764, 766 (6th Cir. 2009) (unpublished opinion) (suggesting *Engquist* should be limited to public employment). We decline to decide that issue today because even applying the traditional framework for evaluating equal-protection claims, EJS's claim fails.

**[16]**These reasons are not merely speculative either, because they were specifically discussed at the Plan Commission hearing after one member raised the concern about treating the TPS proposal equally to the charter school proposal. J.A. at 161-63 (Comm'n Hr. Tr.). Regardless, the decision "may be based on rational speculation unsupported by evidence or empirical data." *TriHealth, Inc. v. Bd. of Commissioners*, 430 F.3d 783, 790 (6th Cir. 2005) (internal quotation marks omitted).

differently. The district court therefore correctly held that EJS failed to "negate every conceivable basis supporting the City Council's action." *Id.* EJS is correct that its failure to negate every conceivable basis for the government's action does not defeat an equal-protection claim if EJS can demonstrate animus or ill-will. We need not reach that issue, however, because the district court also correctly held that EJS and TPS were not similarly situated, the first element of an equal-protection claim.[17]

The district court relied on these same differences to find that TPS and EJS were not similarly situated. *Id.* The first element of a class of one equal-protection claim is that the two applicants who were treated differently were "similarly situated in all relevant respects." *TriHealth, Inc. v. Bd. of Commissioners*, 430 F.3d 783, 790 (6th Cir. 2005). TPS and EJS are facially similar in that they were both seeking to re-zone at least a portion of the exact same lot for the purpose of opening a school, but they also differ in several respects. TPS's application was filed over 18 months after EJS's application, TPS owned the property outright and was permitted under the eminent domain seizure only to use the property as a school, TPS sought to use the entire land as opposed to just a portion of it, and TPS as an arm of the government was more financially stable than a new charter school proposal that relied on both a purchase contract with the actual property owner and a lease with the school provider.

EJS claims the differences are immaterial, but materiality "cannot be evaluated in a vacuum." *TriHealth*, 430 F.3d at 790. Whether these differences are material depends on whether disparate treatment would be justified based on these attributes—i.e., would the city have a rational reason for voting differently due to these traits. *Id.* And as already discussed, the city had a rational basis for treating the more stable proposal of TPS to use the entire lot differently from the riskier proposal of EJS to use only a portion of the lot. Gaps in time and context may suggest a change in policy rather than differential treatment. *Taylor Acquisitions*, 313 F. App'x at 836 (citing *Cordi-Allen v. Conlon*, 494 F.3d 245, 253 (1st Cir. 2007)); *see also Purze v. Vill. of Winthrop Harbor*, 286 F.3d 452, 454-55 (7th Cir. 2002) (applicants to board not

---

[17]It is therefore of no consequence that the district court did not address the ill-will argument.

similarly situated if different time periods and different composition).[18] There were also material differences in the applications, as is the case here.  Thus, the district court did not err in granting summary judgment to the defendants on EJS's equal-protection claim.

## VI.  CONCLUSION

For the aforementioned reasons, we **AFFIRM** the district court's decision granting summary judgment to the defendants on all of EJS's constitutional claims.

---

[18] The composition of the City Council had changed somewhat by the time of TPS's application, but not significantly.