NOT RECOMMENDED FOR PUBLICATION
File Name:  20a0504n.06

No. 19-3920

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| GOLF VILLAGE NORTH LLC; TRIANGLE PROPERTIES, INC., | ) ) ) ) | **FILED**<br>Aug 27, 2020<br>DEBORAH S. HUNT, Clerk |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO |
| CITY OF POWELL, OHIO; DAVID BETZ, in his official capacity as Powell, Ohio's Director of Development, | ) ) ) ) | |
| Defendants-Appellees. | ) ) | |

BEFORE:  BOGGS, GRIFFIN, and READLER, Circuit Judges.

GRIFFIN, Circuit Judge:

This zoning dispute between a land developer and the City of Powell, Ohio stems from the developer's plan to build a hotel on a piece of vacant land.  The developer, Golf Village, argues that the applicable zoning ordinances (which are frozen for fifty years by contract) permit this use, while the City argues that they don't.  Golf Village's efforts in the state administrative system and courts failed because it declined to file an application for a zoning certificate, and the City refused to issue an official land-use determination without one.  So Golf Village filed this § 1983 action alleging due process violations and seeking declaratory relief.

The district court granted summary judgment in favor of the City after holding that Golf Village could not establish a constitutionally protected property interest in developing its land for use as a hotel. In doing so, the court found that the applicable "Development Plan" limited the land's use by implication—that is, it did not include any reference to a hotel, so that use must not be permitted—and the court also identified two provisions that it interpreted as prohibiting such use. We disagree. Guided by well-established rules of statutory construction, we conclude that the Development Plan's text and structure do not support the district court's limitation-by-implication construction. Moreover, we do not read the purported limitations as prohibiting use of the land as a hotel. We therefore reverse the district court's judgment and remand for further proceedings.

I.

A.

Plaintiff Triangle Properties, Inc. has long had ambitious plans for its land holdings in Delaware County, Ohio, which total over 900 acres. Triangle and its subsidiary, plaintiff Golf Village North LLC (collectively, "Golf Village"), envisioned a "planned, comprehensive development" called "Golf Village Community" with "a full complement of residential, commercial, office[,] and light industrial uses." The Community would include, among other things, several types of residential dwellings, a golf course, a "commercial retail center," and offices.

This appeal concerns Golf Village's plan to build a "residential hotel"[1] on two parcels of vacant land ("permanent parcels 319-314-01-001-011 and 319-314-01-001-012") that together comprise about 8.1 acres within "Subarea G" of the Golf Village Community (the "Property"). In 2000, Triangle applied to rezone most of its land in Delaware County. As relevant here, it wanted to rezone Subarea G from "FR-1" ("Farm Residence District") to "PC" ("Planned Commercial and Office District") and listed in its rezoning application two proposed uses for the land: "commercial retail center" and "offices." At the time, the land was located in Liberty Township, which struck a deal with Triangle. The Township agreed to rezone the land and Triangle agreed to "plan, develop, and construct the public infrastructure for the Community with private monies." Liberty Township approved Triangle's rezoning applications in February of 2000, as did the Delaware County Regional Planning Commission. Triangle upheld its end of the bargain as well, putting "tens of millions of dollars into the infrastructure of the Golf Village Community."

In addition to the rezoning applications, Triangle submitted a "Development Plan" to Liberty Township, "setting forth the development standards for the . . . PC Districts within the Golf Village Community." The Development Plan described Subarea G as a "community scale office park." It also included a "Concept Plan" prepared by a design firm, showing a map of Subarea G and describing various parcels of land as "Retail," "Retail/Office," or "Office/Retail."[2]

---

[1]Ohio law defines this term as follows: "'Residential hotel' means any structure or structures consisting of one or more buildings, with more than five dwelling units, that are specifically constructed and approved through a valid certificate of occupancy issued by the building official having jurisdiction, as having both dwelling unit features for non-transient residence purposes and all of the transient residential occupancy features of a transient hotel in accordance with the residential group R-1 use and occupancy classification adopted by the board of building standards pursuant to Chapter 3781 of the Revised Code, and that are kept, used, maintained, advertised, operated as, or held out to the public to be a place where non-transient dwelling units are offered for pay to persons for a minimum stay of more than thirty days." Ohio Rev. Code Ann. § 3731.01(A)(4).

The Township's zoning commission and later its trustees approved the Application and Development Plan in the summer of 2000. At some point, Triangle assigned ownership of the Property to Golf Village North.

In 2002, Triangle submitted an application to amend the Development Plan, "requesting that the sub areas E and G of Golf Village be modified from Planned Office to Planned Office and Commercial to allow for a mixture of these types of uses." It's important to note that this was not a request to rezone the land. Before and after this amendment, the land remained zoned "PC" ("Planned Commercial and Office District").

A development plan, which must be included with a zoning application, limits the uses of land separately, and on a more granular level. The Zoning Resolution provides that the permissible uses for PC-zoned land must be "developed in compliance with the approved Development Plan and standards."

The Development Plan here (as it appeared in the Amendment Application) included a section for "specific limitations or controls to be placed on," among other things, "commercial uses, operations, locations or types of tenants" for Subarea G. Within that section, it listed the following under "Types of tenants":

> Retail
> Office
> Restaurants
> Other uses as per code

It also listed seven "restricted uses" for Subarea G:

> Auto Body Repair
> Storage of wrecked/salvaged vehicles
> Enclosed drive through beverage distribution of alcohol & related beverages
> Operations involving distribution of paraphernalia for illegal drug use

---

[2]The land on which the Property is located was labeled "Retail."

> Operations involving rehabilitation of criminals
> Adult oriented stores distributing pornography and sexually oriented products
> Operations involving slaughtering of livestock and other animals[.]

The Liberty Township Trustees approved the Amendment Application with two exceptions relevant here. First, they mandated that, in the "Types of tenants" section, "Other uses as per code" be changed to "Other uses as per plan." Second, they mandated that the "restricted uses" section be renamed "prohibited uses."

Later in 2002, Triangle, Liberty Township, and the City of Powell, Ohio "began negotiations for the City's annexation of the Golf Village Community." These negotiations produced two agreements: a "Pre-Annexation Agreement" and a "Cooperative Economic Development Agreement" ("CEDA"). "[P]ursuant to the Agreements, the City agreed to adopt, maintain, and administer the existing zoning restrictions - set forth in the [Zoning] Resolution and the Development Plan as previously adopted by the Township - on the Golf Village Community." Also, "Triangle sought and received commitments in the CEDA that the zoning for its property would apply as long as the CEDA was in effect, which was a fifty-year term. Finally, pursuant to the CEDA, the City cannot unilaterally change the zoning of property located within the Golf Village Community."

B.

Fast forward to May 2013. Golf Village contacted David Betz, the City's Development Director, about its plan to build a "residential hotel" on the Property. Nine months later, Betz responded in an email. He concluded that Golf Village's proposed use for the Property was "not specifically permitted by the Golf Village Zoning Plan," and would amount to a "'Major Modification' to the Township Zoning Plan" under the CEDA. Thus, in Betz's view, the proposal

would "require[ ] the review and approval by both the Liberty Township Trustees and Powell City Council."

Golf Village disagreed, and several emails between City officials and Golf Village's employees or attorneys followed. At one point, Tre Giller, Triangle's president, suggested a "condominium development" as an alternate use, but Betz responded that it would "not fall within the allowed zoning as outlined in this plan" either. Betz suggested that an independent living facility for seniors "would work very nicely" on the Property, but Giller responded that "we do not develop that particular product." Throughout these exchanges, Betz's position—that a residential hotel was not a permitted use under the Zoning Resolution and the Development Plan—remained consistent.

In 2016, Golf Village, through its counsel, sent a letter to Betz formally requesting approval to develop the Property as a residential hotel and arguing that "such use is clearly permitted" under applicable zoning and law. A Concept Plan attached to the letter included illustrations of the proposed "Residence of Golf Village." Betz responded, characterizing Golf Village's letter as a "request for . . . an advisory opinion" and refusing to issue such an opinion:

> [T]he City's Zoning Code does not establish a process whereby an applicant may seek an advisory opinion from the Zoning Administrator. Rather, the zoning code clearly contemplates that an applicant must submit a full and complete application for a recommendation by staff and review and consideration by the appropriate boards and commissions.

Betz recommended that Golf Village "prepare an appropriate application for a Zoning Certificate approval pursuant to the applicable zoning requirements."

Golf Village did not do so. Instead, it attempted to appeal to the City's Board of Zoning Appeals. The City responded through its counsel, stating that "no action will be taken with regard to your purported Application for Appeal to the Board of Zoning Appeals" because "there is no

appealable administrative action." The response concluded thus: "If your client desires to submit an appropriate application for Zoning Certificate approval pursuant to the applicable Golf Village zoning requirements, the City would be happy to process such application in due course."

Golf Village then attempted to appeal the City's refusal to consider the zoning appeal to the Delaware County Court of Common Pleas. *See Golf Vill. N., LLC v. City of Powell*, No. 17 CAH 04 0024, 2018 WL 456217, at *1 (Ohio Ct. App. Jan. 11, 2018). The court dismissed the appeal for lack of subject-matter jurisdiction, holding that there was no final order from which to appeal. *See id.* at *3. The Ohio Court of Appeals affirmed the dismissal, *id.* at *1, and the Ohio Supreme Court denied review, *Golf Vill. N., L.L.C. v. Powell*, 98 N.E.3d 296 (Ohio 2018) (table).

C.

Golf Village filed suit against the City and Betz (collectively, "the City") in the United States District Court for the Southern District of Ohio. The amended complaint asserted four claims under 42 U.S.C. § 1983, alleging violations of the Due Process and Equal Protection Clauses of the Fourteenth Amendment. It also sought "a declaration that the Proposed Development is a Permitted Use of the Property." Defendants filed a motion to dismiss based on ripeness and *Younger* abstention, which the district court denied. *Golf Vill. N., LLC v. City of Powell*, 338 F. Supp. 3d 700 (S.D. Ohio 2018).

Following discovery, the parties filed cross-motions for summary judgment. The district court granted the City's motion and denied Golf Village's. It held that Golf Village had not pleaded a substantive due process claim, and, on its procedural due process claim, could not "establish any dispute of material fact that it has a constitutionally protected property interest in a residential hotel or a liberty interest in an informal 'use determination' or other state procedure." Central to this conclusion was the district court's analysis of the Development Plan. It found that

a residential hotel was not a permitted use of the Property because the Development Plan did not expressly allow such use. The court also interpreted language in the "Types of Tenants" section and the Concept Plan as limiting Subarea G to "retail" and "office" uses.

The district court rejected the declaratory judgment claim for similar reasons. Finally, the court opined that the litigation was "really about[ ] obtaining a work-around amendment to the Development Plan via federal litigation instead of through the Agreements' amendment procedures."[3] Golf Village timely appealed.

## II.

We review a district court's summary judgment decision de novo. *Parker v. Winwood*, 938 F.3d 833, 836 (6th Cir. 2019). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if the evidence permits a reasonable jury to return a verdict in favor of the nonmovant, and a fact is "material" if it may affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Viewing the evidence in the light most favorable to the nonmoving party, our task is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

On appeal, the standards we use to "evaluate motions for summary judgment do not change when, as here, both parties seek to resolve the case through the vehicle of cross-motions for summary judgment." *Craig v. Bridges Bros. Trucking LLC*, 823 F.3d 382, 387 (6th Cir. 2016) (brackets, citation, and internal quotation marks omitted). Moreover,

---

[3]The district court also rejected Golf Village's equal protection and vagueness claims under § 1983, but those claims are not at issue in this appeal.

[t]he fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts. Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.

*Id.* (citation omitted). This is not an onerous task here, as the main issue on appeal is a legal one: the proper interpretation of zoning ordinances.

III.

In its motion for summary judgment, Golf Village argued that the City violated its substantive due process rights by refusing "to issue a determination in this case" or "acknowledge the hotel is a permitted use" of the Property. But the district court declined to consider this argument, stating in a footnote that Golf Village did not plead a substantive due process claim in its complaint.[4]

The district court's action here amounts to a dismissal for failure to state a claim, which we review de novo. *In re Fifth Third Early Access Cash Advance Litig.*, 925 F.3d 265, 275 (6th Cir. 2019); *see* Fed. R. Civ. P. 12(b)(6). "We must construe the complaint in the light most favorable to the plaintiff and accept all allegations as true." *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012). "A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8(a). "Specific facts are not necessary; the statement need only give the defendant fair notice of what the claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)

---

[4]The district court also stated that, even if it did consider Golf Village's substantive due process claim on the merits, it "would fail for the same reason that its procedural due process claim fails: Golf Village was not deprived of any protected property or liberty interest."

(ellipsis and internal quotation marks omitted) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

Golf Village properly pleaded a substantive due process claim in its amended complaint. Golf Village's complaint pleaded three separate § 1983 claims based on the Due Process Clause: Counts One, Two, and Four. None of these claims specified whether they were "substantive" or "procedural," but Count Two included the following allegations:

- "Defendants have deprived Golf Village of its property and liberty interests under color of law without due process . . . ."
- "Golf Village's property and liberty interests are of a type protected by the Fifth and Fourteenth Amendments to the United States Constitution[.]"
- "The Zoning Administrator's and City's acts were arbitrary, irrational, [and] capricious[.]"

Compare these statements to the elements of a substantive due process claim "in the context of zoning regulations": "(1) a constitutionally protected property or liberty interest exists, and (2) the constitutionally protected interest has been deprived through arbitrary and capricious action." *Braun v. Ann Arbor Charter Twp.*, 519 F.3d 564, 573 (6th Cir. 2008). Combined with the complaint's numerous factual allegations, these statements in Count Two sufficiently state a claim under Rule 8, despite not specifying that the due process claim was "substantive" in nature. "The Federal Rules of Civil Procedure simply do not require any magic words or recitations to be made in a complaint." *Knapp v. City of Columbus*, 93 F. App'x 718, 720 (6th Cir. 2004).

Moreover, the City demonstrated its awareness of Golf Village's substantive due process claim long before Golf Village filed its motion for summary judgment. In a reply brief in support of its motion to dismiss, the City argued that it "did not violate [Golf Village's] substantive due process rights" because Golf Village did not have a "protected property interest." Then, in its motion for summary judgment, the City included a long quote from a district court case addressing

substantive due process claims. *See Wedgewood Ltd. P'ship I v. Twp. of Liberty*, 456 F. Supp. 2d 904 (S.D. Ohio 2006). These arguments indicate that Golf Village's complaint put the City "on notice" of the substantive due process claim. *See Brown v. Chapman*, 814 F.3d 436, 443 (6th Cir. 2016). Beyond that, the district court itself was aware of Golf Village's substantive due process claim. In its order denying the City's motion to dismiss, the district court mentioned "substantive due process" three times in its discussion of ripeness. *Golf Vill.*, 338 F. Supp. 3d at 707.

For these reasons, we reverse the district court's dismissal of Golf Village's substantive due process claim.

IV.

The Fourteenth Amendment prohibits states from "depriv[ing] any person of life, liberty, or property[ ] without due process of law." U.S. Const. amend. XIV, § 1. "Due process has both a substantive and a procedural component." *Tollbrook, LLC v. City of Troy*, 774 F. App'x 929, 933 (6th Cir. 2019). "Procedural due process is traditionally viewed as the requirement that the government provide a 'fair procedure' when depriving someone of life, liberty, or property; substantive due process 'protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them.'" *EJS Props., LLC v. City of Toledo*, 698 F.3d 845, 855 (6th Cir. 2012) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992)).

Both types of due process claims require that the plaintiff have a constitutionally protected life, liberty, or property interest. *Wedgewood Ltd. P'ship I v. Twp. of Liberty*, 610 F.3d 340, 349 (6th Cir. 2010); *Braun*, 519 F.3d at 573. Golf Village asserts only a property interest on appeal. "Property interests . . . are not created by the Constitution." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). Instead, "[w]hether a person has a 'property' interest is traditionally a

question of state law." *EJS Props.*, 698 F.3d at 855 (citation omitted). "[A] protectable property interest can arise under Ohio law when a government entity restricts a landowner's ability to use his property." *Wedgewood*, 610 F.3d at 353 (discussing *SuperValu Holdings, Inc. v. Jackson Ctr. Assocs., LP*, Nos. CA2005-09-085, CA2005-09-089, 2006 WL 1843588, at *4 (Ohio Ct. App. July 3, 2006)). Here, Golf Village must show it has a "legitimate claim of entitlement or a justifiable expectation in the approval of [its building] plan." *Id.* at 352 (citation and internal quotation marks omitted).

A.

Golf Village's lawsuit in state court failed because it never obtained a final, appealable decision from the City as to whether it could develop the Property as a residential hotel. The City argues that Golf Village's federal lawsuit should fail for the same reason. Fitting this into the context of the due process claims, the City contends that any property interest Golf Village could potentially have in developing the Property as a residential hotel has not "vested" because Golf Village has refused to apply for a zoning certificate. The City relies on general statements of Ohio law from this court's decision in *Wedgewood*:

> In Ohio, it is well-established that a landowner's right to an existing zoning classification vests upon his submission of an application for a building or zoning certificate. *Gibson v. Oberlin*, 167 N.E.2d 651, 654 ([Ohio] 1960). However, vesting does not occur unless the
>
>> property owner has complied with all the legislative requirements for the procurement of a building permit and his proposed structure falls within the use classification of the area in which he proposes to build it, [—if these conditions are met] he has a right to such permit, and there is a duty on the part of the officer charged therewith to issue it.
>
> *Zaremba Dev. Co. v. Fairview Park*, 616 N.E.2d 569, 571 ([Ohio Ct. App.] 1992) [(per curiam)] (quoting *Gibson*, 167 N.E.2d at 654).

610 F.3d at 352 (second alteration in original) (parallel citations omitted).

Ordinarily, the City would be right. "Zoning is not a contract which forecloses its subsequent amendment." *City of Ann Arbor v. Nw. Park Const. Corp.*, 280 F.2d 212, 216 (6th Cir. 1960). Zoning ordinances can change on the whims of local governments, so a "justifiable expectation" of a municipality's zoning laws staying a certain way typically cannot exist in the abstract. *See Wedgewood*, 610 F.3d at 352. Once a zoning application has been filed, however, a city may not "enact a law retroactively, in an attempt to deny a property owner a right to the use of his property when the use of that property is in accordance with the law at the time of the property owner's application." *Zaremba*, 616 N.E.2d at 570–71 (discussing *Gibson*, 167 N.E.2d 651). In other words, filing a zoning application "freezes" the zoning laws at the time of the submission.

Here, however, the zoning laws were already frozen. The Pre-Annexation Agreement and the CEDA provide that the City cannot unilaterally change the zoning of Subarea G for fifty years. Under Ohio law, "[t]he interests created by contracts are . . . property interests." *EJS Props.*, 698 F.3d at 857 (citing *Joseph Bros. v. Brown*, 415 N.E.2d 987, 990 (Ohio Ct. App. 1979)). And Golf Village contends that a residential hotel is a permitted use of the property pursuant to the zoning laws frozen by contract here (the Liberty Township Zoning Resolution and the Development Plan). Thus, Golf Village has a "vested" interest in developing its property within those limitations. Even the City admitted below that it "does not dispute that Golf Village has a right to use its Property for all uses permitted by the existing zoning." And the district court noted that "the Agreements . . . show that Golf Village has a property interest in using its land for retail or office purposes." The real question, however, is whether that interest also includes developing the Property as a residential hotel.

B.

Answering this question requires interpreting the Zoning Resolution and the Development Plan. While the state of the zoning laws here is preserved by contract, the Zoning Resolution itself originated as a local ordinance passed by the Liberty Township Trustees. The City of Powell agreed to "adopt" the "Township Zoning Plan" in the CEDA (in addition to agreeing to accept, incorporate, administer, maintain, and enforce it). Similarly, the Pre-Annexation Agreement states that the City "agrees to approve the Development Plan" and that "[t]he City Council and the Planning Commission have each accepted the Development Plan." These adoptions by the City make the Zoning Resolution and the Development Plan local ordinances that carry the force of law, rather than mere contractual terms.

The interpretation of these zoning ordinances is a question of law. *Key Ads, Inc. v. Dayton Bd. of Zoning Appeals*, 23 N.E.3d 266, 272 (Ohio Ct. App. 2014); *see Kenkel v. Hamilton Cty. Bd. of Cty. Comm'rs*, No. C-010347, 2001 WL 1635770, at *3 (Ohio Ct. App. Dec. 21, 2001) (per curiam) (discussing a zoning resolution and development plan together and interpreting both as zoning ordinances). "When a zoning ordinance is unambiguous, a court needs to merely apply the law as written." *Key Ads*, 23 N.E.3d at 272. If it is "subject to various interpretations, a court called upon to interpret its provisions may invoke rules of statutory construction in order to arrive at legislative intent." *Id.* (quoting *Cline v. Ohio Bureau of Motor Vehicles*, 573 N.E.2d 77 (Ohio 1991)). "[W]hen terms are not defined in a zoning regulation, a court should consider the common and ordinary meaning of those terms." *Id.*

Additionally, the Ohio Supreme Court has made clear that "zoning decisions, whether on an administrative or judicial level, should be based on the following elementary principles which underlie real property law":

> Zoning resolutions are in derogation of the common law and deprive a property owner of certain uses of his land to which he would otherwise be lawfully entitled. Therefore, such resolutions are ordinarily construed in favor of the property owner. Restrictions on the use of real property by ordinance, resolution or statute must be strictly construed, and the scope of the restrictions cannot be extended to include limitations not clearly prescribed.

*Terry v. Sperry*, 956 N.E.2d 276, 279 (Ohio 2011) (quoting *Saunders v. Clark Cty. Zoning Dep't*, 421 N.E.2d 152, 154 (Ohio 1981)).[5] "In other words," the Ohio Supreme Court has stated, "we do not permit zoning 'limitations by implication.'" *Cleveland Clinic Found. v. Cleveland Bd. of Zoning Appeals*, 23 N.E.3d 1161, 1169 (Ohio 2014) (citation omitted).

1.

Starting with the Zoning Resolution, Subarea G is zoned "PC" for "Planned Commercial and Office District." The enumerated "permitted uses" for PC-zoned land include the following:

A.    *Commercial and Office Establishments* of all types developed and maintained within an organized development of associated commercial activities in accordance with the approved Development Plan.

B.    *Community Facilities* such as libraries, offices or educational facilities operated by a public agency or government.

C.    *Commercial Establishments* normally associated with and intended to service the traveling public with motels, service stations, restaurants, travel trailer parks for overnight parking or any other allied activity.

D.    *Other Office and Commercial* ventures not provided by this or other sections of this Resolution.

---

[5]It is unclear whether the language of a development plan should, like that of a zoning resolution, be construed in favor of the property owner. *See Saunders*, 421 N.E.2d at 154. On the one hand, development plans are approved by municipalities and place limitations on land use "in derogation of the common law," same as other zoning ordinances. *Id.* On the other hand, the land developer rather than the municipality is typically the primary drafter. Here, Golf Village does not argue that the Development Plan should be construed in its favor and we need not resolve the question in order to decide this case. As explained below, the plain text of the Development Plan does not prohibit use of the Property as a residential hotel. This is true under a neutral construction of its land-use limitations (as well as a narrow one).

According to the City, the Zoning Resolution does not permit a residential hotel to be built on the Property because that use "is not specifically provided in the Resolution." The City first points to Article III, which states that "[w]here a particular use is not specifically provided for in this Resolution, nor reasonably construed to be included within a use otherwise specifically provided for, the particular use shall not be permitted." Similarly, Article XIV, which concerns PC-zoned land, provides that "[n]o use not specifically authorized by the express terms of this article of the Zoning Resolution shall be permitted."

Here, the City focuses on the Zoning Resolution's limiting language while ignoring its permissive language. First, there's the "reasonably construed" language above. Second, the Resolution specifically permits "motels" "intended to service the traveling public" on PC-zoned land. Combining these provisions, Golf Village persuasively argues that a "residential hotel" amounts to a "reasonable constru[ction]" of a "use specifically provided for" in the Resolution: "motels" "intended to service the traveling public." *Compare Random House Webster's Unabridged Dictionary* 925 (2d ed. 2001) (defining "hotel" as "a commercial establishment offering lodging to travelers and sometimes to permanent residents, and often having restaurants, meeting rooms, stores, etc. that are available to the general public"), *with id.* at 1253 (defining "motel" as "a hotel providing travelers with lodging and free parking facilities, typically a roadside hotel having rooms adjacent to an outside parking area or an urban hotel offering parking within the building"). Moreover, we must construe the Zoning Resolution's language in favor of Golf Village, which further strengthens its argument. *Saunders*, 421 N.E.2d at 154. Thus, a residential hotel is a permissible use of PC-zoned land pursuant to the Zoning Resolution.

The City also argues that because the term "residential hotel" "is identified in the Ohio Revised Code as a residential—not commercial—use," it is not a permissible use of PC-zoned

land.  This argument is misleading.  Ohio Revised Code § 3731.01(A)(4), which defines the term "residential hotel," includes the phrase "residential group R-1 use," but in the context of "building standards," not zoning ordinances.  In fact, defendant Betz admitted in an email to Golf Village's counsel that "[a]lthough the building plan may be rooted within the [Ohio Revised Code] as a 'residential hotel', that is a review matter for the Building Department and has no bearing upon local zoning regulations."  This makes sense, as "zoning . . . power is usually delegated in state enabling legislation to local levels of government," and it was here.  *City of Cleveland v. City of Brook Park*, 893 F. Supp. 742, 751 (N.D. Ohio 1995) (citation omitted); *see also Cook-Johnson Realty Co. v. Bertolini*, 239 N.E.2d 80, 84 (Ohio 1968) ("[T]his court has already recognized the validity of a statutory grant of authority by the General Assembly to township trustees to legislate as to matters of purely local concern, such as zoning.").

The City argued for the first time at oral argument that the residential hotel Golf Village plans to build on the Property is actually an apartment complex.  Because an apartment building is a residential use, the City contends—and the dissent agrees—that it does not fall within the permitted uses of PC-zoned land.  But "a party does not preserve an argument by raising it for the first time at oral argument." *United States v. Huntington Nat'l Bank*, 574 F.3d 329, 331 (6th Cir. 2009).  The City forfeited this argument by failing to raise it in its brief on appeal, and we will not consider it. *See Cent. Ohio Coal Co. v. Dir., Office of Workers' Comp. Programs*, 762 F.3d 483, 490 (6th Cir. 2014).

2.

The district court found that whether the Zoning Resolution's permitted uses for PC-zoned land include a residential hotel "is irrelevant here" because the Development Plan limits Subarea G to "a much narrower set of uses."  Under the Zoning Resolution, the permitted uses for PC-

zoned land must be "developed in compliance with the approved Development Plan and standards." A development plan must describe "[t]he general development character of the tract including . . . [t]he specific limitations or controls to be placed on commercial uses, operations, locations or types of tenants." And the Zoning Resolution provides that "[i]n their interpretation and application, the provisions of this Resolution shall be held to be minimum requirements. . . . [W]here the provisions of this Resolution are less restrictive, the more restrictive provision of other laws, rules, regulations or restrictions shall control."

The district court identified two limitations in the Development Plan that, in its judgment, precluded use of the Property as a residential hotel. First, it found that the Development Plan "designates Subarea G as a 'retail/office site[ ]'" and "does not reference a hotel, let alone a residential one." This language appears in the "Concept Plan" Golf Village submitted as an exhibit to the Development Plan in the 2002 Amendment Application. The Concept Plan is a map showing the various parcels in Subarea G and describing them as "Retail," "Retail/Office," or "Office/Retail." The second limitation appears in the section of the Development Plan listing "specific limitations or controls to be placed on commercial uses, operations, locations or types of tenants," among other things. Under "Types of tenants," it lists "Retail," "Office," "Restaurants," and "Other uses as per plan." The district court noted that "[t]hose uses do not include, at least by the Development Plan's express terms, a residential hotel."

Both of these limitations are by implication. Neither one (or any other provision of the Development Plan, for that matter) specifically prohibits use of the Property as a residential hotel. And unlike the Zoning Resolution, the Development Plan does not contain a provision stating that all uses not listed (or reasonably construed to fall within a listed use) are prohibited. This falls in line with the Zoning Resolution's requirements for development plans. The Zoning Resolution

does not state that development plans must specifically list every permitted use. Instead, it provides that development plans must list "specific *limitations* or controls to be placed on commercial uses, operations, locations or types of tenants." (Emphasis added.) Consistent with that requirement, the Development Plan here enumerates seven specific "prohibited uses," none of which encompasses residential hotels.

To conclude that the Development Plan does not permit use of the Property as a residential hotel because it does not specifically list that use would violate a basic rule of statutory construction. "[W]ords in statutes should not be construed to be redundant, nor should any words be ignored. . . . No part should be treated as superfluous unless that is manifestly required, and the court should avoid that construction which renders a provision meaningless or inoperative." *D.A.B.E., Inc. v. Toledo-Lucas Cty. Bd. of Health*, 773 N.E.2d 536, 543 (Ohio 2002) (citation and internal quotation marks omitted). This interpretation would render the "prohibited uses" section of the Development Plan "meaningless or inoperative." That is, if the only permitted uses for the Property were the ones specifically named, then there would be no need to enumerate specific uses that are *not* permitted. What's more, the Zoning Resolution requires that development plans list "specific limitations," not "specific permitted uses." So under the district court's interpretation, every development plan drafted in compliance with the Zoning Resolution would have a superfluous section. That result cannot be correct. Interpreting the Development Plan as allowing all uses under PC-zoned land, except for those it specifically identifies as "prohibited uses," is the better reading. *Cf. Fettro v. Rombach Ctr., L.L.C.*, No. CA2012–07–018, 2013 WL 2423797, at *3–4 (Ohio Ct. App. June 3, 2013) (finding that a church was a permitted use of a property where no provision in the parties' development agreement expressly prohibited churches).

Against this backdrop, the structure of the Development Plan provides additional evidence that the "limitations" identified by the district court do not prohibit use of the Property as a residential hotel. Take the Concept Plan and its labeling of various portions of Subarea G as "retail," "office," or both. The Concept Plan was included as an exhibit to the Development Plan, and § 14.06(B) of the Development Plan incorporates the Concept Plan by reference. Section 14.06(B)(2), a separate subsection, contains the following heading with language taken from Zoning Resolution: "specific limitations or controls to be placed on commercial uses, operations, locations or types of tenants, numbered lots and sizes, approximate location of roads, entry features, retaining ponds and utility lines, and description of other development features including landscaping." The list of "prohibited uses" appears in that subsection. At the end of that enumerated list, it provides that "[s]pecific limitations or controls to be placed on commercial and office uses may be found in the Development Standards portion of this text" (and gives some examples of "[s]pecific issues to be addressed" therein, like "building setbacks" and "side and rear yards"). Detailed descriptions of "General Development Standards" and "specific statements of divergence from [other ordinances'] development standards" appear in other sections.

Thus, the Development Plan lists its "specific limitations or controls to be placed on commercial and office uses" in specific sections labeled as such, and the Concept Plan does not appear in that section, nor does any reference to it. If Golf Village or the Liberty Township Trustees had intended for the Concept Plan to limit the use of Subarea G (after choosing not to say so specifically), they would have included some reference to it in this specific section. Because they did not, it would be improper to infer such a narrow limitation from it. *See Univ. Circle, Inc. v. City of Cleveland*, 383 N.E.2d 139, 141 (Ohio 1978) ("[I]n determining the legislative intent of an ordinance, the provision to be construed should not be reviewed in isolation. Its meaning should

be derived from a reading of the provision taken in the context of the entire ordinance."); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 167 (2012) ("[T]he whole-text canon . . . calls on the judicial interpreter to consider the entire text, in view of its structure and of the physical and logical relation of its many parts.").

As for the "other uses as per plan" language, the district court interpreted it as "limit[ing] the permitted uses of the planned commercial properties covered by the Development Plan to a subset of the broader categories of permitted uses allowed by Section 14.03 of the Township's Zoning Resolution." Unlike the Concept Plan, this language does appear in the "specific limitations" section of the Development Plan. But within that section, it is included in the list of "Types of tenants," along with "Retail," "Office," and "Restaurants." Definitions of "tenant" include "a person or group that rents and occupies land, a house, an office, or the like, from another for a period of time; lessee"; "a person who holds or possesses for a time lands, tenements, or personalty of another, usually for rent"; and "an occupant or inhabitant of any place." *Random House Webster's Unabridged Dictionary* 1955 (2d ed. 2001); *see also Black's Law Dictionary* 1695 (10th ed. 2014) ("Someone who holds or possesses lands or tenements by any kind of right or title.").

Golf Village argues that this list was included in the Development Plan "should the developer decide to rent the property to commercial or office tenants," and that it "is not a tenant but [rather] the owner and developer of the Property." But the ordinary meaning of the word "tenant" is broader than "an occupant of land who pays rent to the owner." As a "hold[er] or possess[or of] lands," Golf Village qualifies as a tenant. *See Kniebbe v. Wade*, 118 N.E.2d 833, 836 (Ohio 1954) (referring to co-owners of property as "tenants in common"). And even though

Golf Village itself is not listed in the "Types of tenants" section, no one in this case argues that this means Golf Village is not entitled to occupy or use its land in Subarea G.

Meanwhile, the City argues that the "Types of tenants" list provides specific "permitted uses for the properties in Subarea G," to the exclusion of all other uses. But the words "tenant" and "use" are not synonymous. *See Black's Law Dictionary* 1775 (10th ed. 2014) (defining "use" as "[t]he application or employment of something; esp., a long-continued possession and employment of a thing for the purpose for which it is adapted"). The "prohibited uses" list in the same section shows that Golf Village and the Liberty Township Trustees knew how to distinguish between the two terms.

But the "other uses as per plan" language that appears under "Types of tenants" obviously complicates matters.[6] Even if we assume, as the district court did, that the City's interpretation is correct though, use of the Property as a residential hotel qualifies as one of the "other uses as per plan." The parties seem to agree that the word "plan" here refers to the Development Plan. But they disagree as to the legal effect of that provision. According to Golf Village, "'other uses as per plan' means 'other uses as per the Development Plan, a catch-all encompassing all permissible uses in the PC District under the Resolution for Subarea G.'" The City maintains that this provision limits the use of the land in Subarea G to the labels found in the Concept Plan. As discussed above, we have already resolved that issue in Golf Village's favor. The Concept Plan does not limit the uses of Subarea G, and the limitations that do appear in the Development Plan do not prohibit the use of the Property as a residential hotel. We therefore agree with Golf Village's interpretation of this provision.

---

[6]The three specific terms that appear under "Types of tenants"—"Retail," "Office," and "Restaurants"—could be fairly interpreted as "uses" or "tenants."

Why include this language, then, if all it does is state that all "other uses" permitted by the Development Plan are permitted by the Development Plan? The drafting history of the document contextualizes this clunky provision. Recall that the original language here was "other uses as per code." The district court noted that this passage could be interpreted as "allowing Golf Village to develop Subarea G for any permitted purpose enumerated in the Township's Zoning Resolution." In other words, Golf Village could use that language to try to circumvent the specific prohibitions included in the Development Plan. The Liberty Township Trustees closed this potential loophole by mandating that "code" be changed to "plan" before it adopted the Development Plan. Thus, the self-referential nature of the "other uses as per plan" provision was intentional.

C.

We conclude that a residential hotel is a permitted use of the Property pursuant to the Development Plan and the Liberty Township Zoning Resolution, and that Golf Village has a constitutionally protected property interest (pursuant to the Pre-Annexation Agreement and the CEDA) to such use of the Property. Golf Village is thus entitled to judgment as a matter of law as to the first element of its due process claims, and we reverse the district court's contrary conclusion. The district court did not address the remaining elements of either due process claim. "As a court of review, not of first view, we will remand this case to the district court" to consider those issues in the first instance. *Cavin v. Mich. Dep't of Corr.*, 927 F.3d 455, 459 (6th Cir. 2019) (citation and internal quotation marks omitted).

V.

In its complaint, Golf Village sought "a declaration that the Proposed Development [to build a residential hotel] is a Permitted Use of the Property." The district court dispensed with this claim in short order, "ha[ving] already concluded that there is no dispute of material fact that,

under the Agreements and Development Plan executed by the parties, Golf Village does not have a property interest in the use of its land as a residential hotel." Golf Village's narrow request is consistent with the conclusion that it does have property interest in developing the Property as a residential hotel. Accordingly, we reverse the district court's grant of summary judgment in the City's favor and its denial of summary judgment in Golf Village's favor on this claim, and remand with instructions to enter partial summary judgment in favor of Golf Village.

VI.

To summarize, we reverse

- the district court's dismissal of Golf Village's substantive due process claim for failure to state a claim,
- the district court's grant of the City's motion for summary judgment as to Golf Village's procedural due process and declaratory judgment claims, and
- the district court's denial of Golf Village's motion for summary judgment as to the declaratory judgment and due process claims.

Additionally, we remand

- with instructions to enter partial summary judgment in favor of Golf Village as to its declaratory judgment claim and as to the first element of its due process claims,
- for consideration of the cross-motions for summary judgment as to the remaining elements of Golf Village's due process claims, and
- for further proceedings consistent with this opinion.

It is so ordered.

**CHAD A. READLER, Circuit Judge, dissenting.** As this dispute worked its way through every level of the Ohio courts, not a single one believed the dispute had properly ripened. Those courts uniformly agreed that because Golf Village had not obtained a formal threshold local zoning decision, the matter was not justiciable. *Golf Vill. N., LLC v. City of Powell*, No. 17 CAH 04 0024, 2018 WL 456217, at *1 (Ohio Ct. App. Jan. 11, 2018), *appeal denied*, 98 N.E.3d 296 (Ohio 2018) (table). Rather than stepping in to resolve a dispute that local regulators and the state courts agree has not yet matured, I would affirm the district court's rejection of Golf Village's various due process theories.

All agree that Golf Village submitted a development plan designating the parcel in question as intended for "retail" and "office" use. Golf Village later proposed to build a "residential hotel" on the property, a structure with many attributes of a traditional apartment building. Given those residential (rather than commercial) features, the City of Powell's Director of Development explained that the proposal did not square with the zoning parameters previously agreed upon. At the same time, the Director made clear that his determination was not final, and invited Golf Village to apply for a zoning certificate, a multi-tiered administrative process codified in Powell's zoning ordinance. But Golf Village bypassed that formal application process, and instead challenged the Director's informal opinion with the Board of Zoning Appeals, then the state courts (all the way to the Ohio Supreme Court), and now the federal courts.

In the interests of comity and federalism, we enter into local disputes reluctantly, typically only to vindicate a right guaranteed by the Constitution or laws of the United States. *See Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1222 (6th Cir. 1992). To that end, Golf Village purports to dress its claims in due process clothing. Viewing those claims through that same lens, the

district court held that Golf Village had not shown a property interest in building a residential hotel deserving of due process protection.

Had Golf Village properly developed its claims in administrative and state tribunals, this dispute would be much easier for us to resolve, in the unlikely event it even reached the federal courts. Without a doubt, the zoning certificate application process would have better informed the question of whether Golf Village has a vested property interest in building a residential hotel. *See* Powell Codified Ordinances § 1135.03(a) (listing fourteen categories of information to be included in zoning certificate application). Between proceedings before the City's planning and zoning commissions, its City Council, and the sister Liberty Township Board of Trustees, Golf Village would have made a record, articulated its position before local experts, and exhausted the remedies available. Yet Golf Village short circuited that administrative process. And in that void, it is difficult to see how Golf Village has established a property interest in building a residential hotel. That is true whether one looks to the relevant zoning ordinance or to the subsequent development plan submitted by Golf Village.

Start with the zoning ordinance. Golf Village proposes to build a "residential hotel" to be known as the "Residence of Golf Village." Ohio law generally describes a residential hotel as "a place where *non-transient* dwelling units are offered for pay to persons for a minimum stay of more than thirty days." Ohio Rev. Code Ann. § 3731.01(A)(4) (emphasis added). Despite this statutory backdrop and the "residential" label attached to the development, Golf Village claims its proposed use nonetheless qualifies as a "motel" or other "commercial venture" permitted by the ordinance. True, the ordinance allows for commercial establishments "normally associated with and intended to service the *traveling* public with motels, service stations, restaurants, travel trailer parks for *overnight* parking or any other allied activity." But a residential hotel, as a "non-

transient" dwelling, would not "normally [be] associated" with the "traveling public." Members of the traveling public, rather, frequent "transient" dwellings. Ohio Rev. Code Ann. § 3731.01(A)(6) ("'Transient' means not more than thirty days."). Put differently, the traveling public's "overnight" accommodations typically do not extend "for a minimum of more than thirty days," an unusually long time for a motel to leave the light on for you. *See Residential Hotel*, Encyclopedia Britannica, https://www.britannica.com/technology/residential-hotel (last visited July 16, 2020) (defining "residential hotel" as "basically an apartment building" offering certain amenities).

Here again, pursuing this dispute through proper channels would have shed light on the nature of Golf Village's proposal. What we know at this point is that the residential hotel "will be advertised in local apartment guides to local clientele." "[M]ost of the occupants . . . will enter into an occupancy agreement with a term of twelve (12) months." And an occupied unit "will likely be an occupant's primary address and occupants will be responsible for their own utilities as well as cable and telephone services." These features share the hallmarks of an apartment building more so than a retail store, office, or restaurant—or for that matter, a motel. Indeed, one can easily distinguish between an overnight motel and an apartment leased for a year or more. Yet even after years of negotiation, and now litigation, one is still scratching their head over what sort of structure Golf Village would like to construct, the degree to which it differs from a traditional motel, and why this proposed use would not more appropriately fall under a residential zoning category. *See* Liberty Township, Ohio, Zoning Res. § 5.01 (June 20, 2002) (listing other available zoning categories, to include the "Neighborhood Apartment District" and the "Planned Residence District"). Tellingly, Golf Village alternatively proposed to build "either a residential hotel or a condominium development," confirming the long-term residential nature of its intended project.

And I would not fault the City for any uncertainties in these proceedings—factual, legal, or otherwise—when Golf Village is the master of its vision for the property, and the one that forewent required administrative steps.

Golf Village fares no better under the development plan it submitted. In the section that asked for "specific limitations or controls to be placed on commercial uses . . . or types of tenants," the plan initially listed "Retail," "Office," "Restaurants," and "other uses as per code." But the City rejected the "other uses as per code" language, and the plan was revised to allow for "Retail," "Office," "Restaurants," and "other uses as per plan." So even if the zoning ordinance, standing alone, does not require that the development plan list every use, the "other uses as per plan" language independently narrows the development plan to only those uses listed. And that "as per plan" language understandably "complicates matters" for Golf Village, as none of the categories of permitted uses reference a residential hotel, or anything that could be construed as one.

None of the majority opinion's rationales overcome this plain reading. One is that a residential hotel qualifies as an "other use[] as per plan" because the plan allows for any use permitted *by the code*, unless specifically excluded. That rationale, however, simply replaces the phrase "other uses as per plan" with "other uses as per code," the latter of which the City expressly struck from the plan.

Another is that the list of permissible development types is placed under "types of tenants," not "types of uses." But the list itself expressly refers to "other uses." Equally true, the majority opinion concedes that Golf Village qualifies as a tenant. So whether the plan's language limits the types of tenants or the types of uses (or both), it prohibits Golf Village and other tenants from uses that are not "as per plan."

Yet another is that the "prohibited uses" in the development plan would be superfluous if only the uses in the plan were permitted. At first blush, one could see why there would be no need to add exclusions to the plan when the specific uses were the only uses allowed. But there are at least two other ways to explain the list of exclusions.

One is that they are derived from uses the plan would otherwise permit—that is, retail establishments, offices, restaurants, or other uses allowed by the plan. In that sense, the plan may be read as saying that only these plan-specified uses are allowed, with a subset of those permitted uses in fact also excluded, as they are expressly named exceptions.

A second is that the plan employs a practical "belt-and-suspenders" approach, ensuring that its terms cannot be interpreted to permit the excluded uses, no matter how these uses might otherwise be categorized (commercial, retail, etc.). Drafters sometimes include superfluous terms to make certain that no question remains on a given point. *See, e.g.*, *Rimini St., Inc. v. Oracle USA, Inc.*, 139 S. Ct. 873, 881 (2019) ("Redundancy is not a silver bullet. . . . Sometimes the better overall reading of the statute contains some redundancy."); *King v. Burwell*, 135 S. Ct. 2480, 2498 (2015) (Scalia, J., dissenting) ("Lawmakers sometimes repeat themselves—whether out of a desire to add emphasis, a sense of belt-and-suspenders caution, or a lawyerly penchant for doublets (aid and abet, cease and desist, null and void)."). And it takes little imagination to understand why the City may have hoped to avoid, in a landmark commercial development, the slaughtering of livestock and the distribution of sexually oriented products.

In short, under neither the development plan nor the ordinance has Golf Village established a property interest in developing a residential hotel for purposes of either a substantive or procedural due process claim. At the very least, it was not arbitrary and capricious for the City

not to approve this use without "the benefit of a full and complete application with detailed information with regard to the proposed [use]"—as the City previously explained to Golf Village.

\*     \*     \*     \*     \*

Even if Golf Village somehow established a property interest in its proposed development, its failure to seek formal administrative approval further dooms its due process claims. Start with substantive due process. Golf Village has the burden to show that the City deprived it of its lawful property interest by means of "arbitrary and capricious action." *Braun v. Ann Arbor Charter Township*, 519 F.3d 564, 573 (6th Cir. 2008). But what was Golf Village denied? The Ohio courts, remember, concluded that Golf Village never obtained a final decision from the City, as it never sought (and in turn was never formally denied) a zoning certificate. Yes, the City refused to issue an informal "use determination." But it is unclear that a process for doing so even exists, or why obtaining one would be anything more than a discretionary, non-binding "advisory opinion." One would thus be hard pressed to describe the City's refusal as arbitrary or conscience-shocking behavior. *See EJS Props., LLC v. City of Toledo*, 698 F.3d 845,862 (6th Cir. 2012).

Procedural due process fares no better. The City repeatedly invited—and indeed still invites—Golf Village to follow the required path set out in local law for obtaining a zoning certificate. *See* Powell Codified Ordinances § 1135.02 ("**ZONING CERIFICATES REQUIRED.** No building, sign or other structure shall hereafter be located, erected, constructed, reconstructed, moved, enlarged, added to, demolished, structurally altered, nor shall any work be started on same . . . without a certificate therefor, issued by the Zoning Administrator."). Yet despite that formal notice and guidance from the City's Development Director, Golf Village forewent its "opportunity to be heard." *See Warren v. City of Athens*, 411 F.3d 697, 708 (6th Cir. 2005). That failure fatally flaws its procedural due process claim. *Quinn v. Shirey*, 293 F.3d 315,

321–22 (6th Cir. 2002) (explaining that a procedural due process claim fails where a party fails to avail itself of adequate process provided by the defendant).

The district court is free to resolve the due process claims against Golf Village on remand. But I would save it the trouble.  I respectfully dissent.